**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

ERIC SAM and YOLANDA SATEMYA WRIGHT,

        Plaintiffs,

vs.

CARRIO MOTOR CARS, INC.,
AUTOMOTIVE GROUP ENTERPRISES, INC.
d/b/a CARRIO MOTOR CARS, and
JONATHAN BONANNO,

        Defendants.

_____/

## COMPLAINT

Plaintiffs ERIC SAM ("**Sam**") and YOLANDA SATEMYA WRIGHT ("**Wright**," and together with Sam, "**Plaintiffs**") sue Defendants CARRIO MOTOR CARS, INC. ("**CMC**"), AUTOMOTIVE GROUP ENTERPRISES, INC. doing business as CARRIO MOTOR CARS ("**AGE**"), and JONATHAN BONANNO ("**Bonanno,**" and together with CMC and AGE, "**Defendants**"), and allege as follows:

### INTRODUCTION

1. This case involves a classic "yo-yo" or "spot delivery" scam, one of the most widespread car dealer abuses today. *See* National Consumer Law Center, Automobile Fraud: Yo-Yo Transactions Explained (5th ed.), available at https://library.nclc.org/book/automobile-fraud/412-yo-yo-transactions-explained.

2. In a yo-yo transaction, an unscrupulous dealership leads an unwitting consumer to believe that their agreement to finance the purchase of a car is final, typically based upon representations that the consumer's credit application has been "approved." Relying on that

representation, the consumer signs paperwork to buy the car and makes a downpayment.  The dealership then gives the consumer possession of the car "on the spot."  And the consumer drives away from the dealership believing that the transaction is complete.

3. However, the dealership later "yo-yos" the consumer back to the dealership, typically by representing that their previously "approved" credit application had been "denied." The dealership tells the consumer that, because their original deal fell through, they need to return the car and lose their downpayment, unless they agree to a new deal to buy the car.  The new deal almost always involves much less favorable terms than the original deal, such as a higher interest rate, higher monthly payment, or higher downpayment.

4. In its most insidious form, a yo-yo sale is a premeditated sales tactic to squeeze more money out of the consumer by attempting to cancel the first contract and forcing the consumer to sign a new contract with much less favorable terms.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs sue Defendants under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants reside in, and the events, actions, and omissions giving rise to this case occurred within the Southern District of Florida.

## PARTIES

7. Plaintiffs are brother and sister.  Both are over the age of 18.  They reside together in Miami-Dade County, Florida.

8.      Defendant CMC is a Florida corporation with its principal place of business at 5120 North State Road 7, Fort Lauderdale, Florida 33319.  It is a "Buy Here, Pay Here" dealership engaged in the business of selling used cars and/or extending consumer credit for the purchase of used cars.  Upon information and belief, CMC is owned by, among others, Jacob Carrio.

9.      Defendant AGE is a Florida corporation doing business under the fictitious name of "Carrio Motor Cars" with its principal place of business at 5120 North State Road 7, Fort Lauderdale, Florida 33319.  It is engaged in the business of selling used cars and/or extending consumer credit for the purchase of used cars.  AGE is the in-house finance company for CMC.  Upon information and belief, AGE is owned by, among others, Jacob Carrio.

10.     Upon information and belief, Defendant Bonanno is over the age of 18 and a resident of Miami-Dade County, Florida.  Among other things, Bonanno is engaged in the business of soliciting and brokering used car purchases and financing for CMC and AGE.  At all relevant times, Bonanno was acting as the actual or apparent agent of CMC and AGE as evidenced by, among other things, his countless written admissions.  *See, e.g.*, Ex. B at p. 2 ("Bro u should buy yourself a Rolls Royce truck. I got a few badass ones I can get you approved on. Don't need credit[.]"); *id.* at p. 3 ("$150-$175k down I get you approved no matter the credit[.] 2021 1700 miles brand new truck"); *id.* at p. 4 ("I can get you approved today. Have truck in your hands before dinner[.] It's a half million dollar car dude. I can do $499,999 best I can do[.]"); *id.* at p. 5 ("Normally you can always assume $2k per $100k borrowed. But it could be few dollars lower just depends how I can get bank to structure[.]  But around $150k down and around $6 month is what to expect[.] . . . I want to get your business[.]"); Ex. E at p. 3 ("100% approval rate still in effect.  Bro this truck a winner. Congrats"); *id.* at p. 4 ("Can you send pics of both the cards for both watches so they can put serial numbers on documents so it's all ready when u arrive pls sir");

*id.* at p. 6 ("Bro where are you?  I told my ppl 6:30 latest and u making me look bad it's almost 9pm man"); *id.* ("Bro what's the deal? U got my ppl sitting waiting, if you not coming all you had to do was say. Not cool to just go ghost man, been working to get this done for you all day to just have u no show, and not even call."); Ex. C at p. 2 ("Hey bro. U get the app in?"); *id.* ("Never got the app in brother."); *id.* ("Let me get the approval and paperwork done.  We can handle the $$ next week."); *id.* at p. 3 ("Working on it [credit application] now"); *id.* at p. 7 ("Jacob [Carrio] my finance guy might call u just fyi"); *id.* ("Hey bud, my guy just asked if you had an ETA so he knows when to expect you.  Congratulations btw… this the most badass truck on the whole east coast[.]"); *id.* at p. 9 ("U still coming? No pressure I'm just tryna plan so I'm here when u come"); *id.* at 12 ("Bro I told u that before I got ur credit and bank statements, had negative money in the bank and credit of a homeless person. . . Typically it's only $150k down but after running your shit that's not a deal that could be worked. . . . You're a big boy if you couldn't afford the down payment you shouldn't have signed the deal.").

## FACTS

### Defendants solicit Plaintiffs to buy a car, representing that their credit application would be "approved no matter the credit."

11.     In this case, Plaintiffs were the victims of a "yo-yo" scam perpetrated by Defendants in the fall of 2022.  Defendants lured Plaintiffs into executing a contract to buy a used 2021 Rolls Royce Cullinan for $550,000.00 – approximately $50,000.00 more than the price advertised and guaranteed in writing by Defendants.  *See* Ex. A, CMC's Instagram Ad at p.1 ("$499,998.00") & Ex. B, Bonanno's Instagram Messages at p.4 ("I can do $499,999 best I can do[.]").

12.     Specifically, on September 14, 2022, Bonanno solicited Sam to buy a used 2021 Rolls Royce Cullinan from Carrio Motor Cars.  Bonanno represented that the car had only 1,700

miles (which was 244 miles less than its actual mileage) and that it was for sale for $499,999.00. Ex. B, Instagram Messages from Bonanno at p. 3.  As Bonanno texted Sam, "Bro u should buy yourself a Rolls Royce truck. *I got a few badass ones I can get you approved on. Don't need credit*[.]"  *Id.* at 2 (emphasis added).

13.     As part of the solicitation, Bonanno told Sam that with "*$150-$175k down I get you approved no matter the credit. . . . I can get you approved today. Have truck in your hands before dinner*[.]" Ex. B at pp. 3-4 (emphasis added).

**Plaintiffs submit a credit application to Defendants,
which Defendants represented was "approved."**

14.     In reliance upon these representations, on or about September 15, 2022, Plaintiffs submitted a credit application to Defendants.

15.     Upon receipt of Plaintiffs' credit application, Bonanno once again assured Plaintiffs that their credit application to finance their purchase of the Rolls Royce had been "approved," writing "*100% approval rate still in effect.*" Ex. E at p. 3 (emphasis added).

16.     Defendants then told Plaintiffs that the contracts to buy the car were "ready to go" and sent them "[t]he address [of the dealership] to *go sign docs and get your new Rolls Royce*[.]" Ex. E at p. 4 (emphasis added).

**Relying upon Defendants' representation that their credit application had been
"approved," Plaintiffs sign the original Buyer's Order with $150,000.00 downpayment.**

17.     On September 16, 2022, believing that their credit application had been fully approved, Plaintiffs went to CMC to buy the car for $499,999.00 with a downpayment of $150,000.00. However, while at the dealership, Defendants duped Plaintiffs into signing a Buyer's Order to purchase the car for $550,000.00 with a downpayment of $150,000.00.  Ex. F, Buyer's Order.  This sales price of $550,000.00 was $50,000.00 more than the price advertised and

guaranteed by Defendants in writing. *See* Ex. A, CMC's Instagram Ad at p.1 ("$499,998.00") & Ex. B, Bonanno's Instagram Messages at p.4 ("I can do $499,999 best I can do[.]").

**Plaintiffs make $150,000.00 downpayment, and Defendants represent that the deal is final.**

18.     In accordance with the Buyer's Order, Plaintiffs made the $150,000.00 downpayment to Defendants using a combination of cash ($30,000.00) and luxury jewelry ($120,000.00), which Defendants acknowledged receiving. *See* Ex. G, Collateral as Cash Receipt & Ex. H, Non-Refundable Deposit Agreement for $150,000.00.

19.     After receiving the downpayment, Defendants led Plaintiffs to believe the deal was complete and final. So, Plaintiffs left the dealership with the car.

20.     The following day, Defendants doubled down on their representations that the deal was complete and final, writing: "*Congratulations again my brother. That is a badass truck u got*[.]" Ex. C at p. 8 (emphasis added); *see also* Ex. D at p. 7 ("Whats up brother[?] How you liking the Cullinan?").

**Defendants "yo-yo" Plaintiffs back to the dealership
by telling them their "approved" credit application had been "denied."**

21.     In the days that followed, however, Defendants reversed course and told Plaintiffs that their previously "approved" credit application had been "denied" because they allegedly had the "credit of a homeless person." Ex. C at p. 12. Yet Plaintiffs never received any notice from any potential lender that their credit application had allegedly been "denied," as required by law.

22.     In furtherance of their "yo-yo" scam, Defendants also represented that Plaintiffs needed to return the car and lose their downpayment unless they signed paperwork for a new deal with different material terms, including a substantially higher downpayment.

**Plaintiffs sign a second Buyer's Order with $225,000.00 downpayment.**

23.     On or about September 20, 2022, Defendants yo-yoed Plaintiffs back to the

dealership to sign a new Buyer's Order that was unlawfully backdated to September 16th to buy the car with a much higher downpayment of $225,000.00, which was $75,000.00 more than the $150,000.00 Plaintiffs had already paid to Defendants.  *See* Ex. I, Second Buyer's Order; *see also* Ex. J, Second Non-Refundable Deposit Agreement.

**Plaintiffs sign a RISC riddled with inaccuracies.**

24.     Plaintiffs also signed an Installment Contract and Security Agreement ("RISC"), which was also unlawfully backdated to September 16th.  *See* Ex. K, Installment Contract and Security Agreement.  The RISC purported to require Plaintiffs to buy the car for $550,000.00 with a $225,000.00 downpayment at a rate of 18.9% interest.  *Id.*

25.     Aside from requiring a larger downpayment, the RISC also failed to accurately disclose the "total sale price," the total "finance charge," and the "total of payments," as required by law.  *See* § 520.07(2), Fla. Stat.

**Plaintiffs pay Defendants an additional $40,000.00.**

26.     Thereafter, Plaintiffs paid Defendants an additional $40,000.00 for a total downpayment of $190,000.00.

27.     However, Defendants claimed that an additional $35,000.00 was due by October 4, 2022, to fulfill the alleged "new" downpayment of $225,000.00.

28.     On October 5, 2022, Plaintiffs advised that they were in the process of getting more money together for Defendants, but "if anything [would] just pick a other car that's less of a deposit cause I don't like owein people money like that . . . ."  Ex. E at p. 11.

**Plaintiffs pay Defendants an additional $10,000.00,
for a total downpayment of $200,000.00.**

29.     Later that day on October 5th, Plaintiffs paid Defendants another $10,000.00 in cash, which Defendants acknowledged receiving, bringing their total downpayment to

$200,000.00. *See* Ex. D at p. 10 ("$10,000 received today").

30.     Defendants then claimed that an additional $25,000.00 was due from Plaintiffs by January 18, 2023, to fulfill the alleged "new" downpayment of $225,000.00. *See* Ex. D at p. 12 ("$25,000 by January 18th as discussed").

**Defendants repossess the car.**

31.     When Plaintiffs were unable to pay an additional $25,000.00 by January 18th, upon information and belief, Defendants used the police to help repossess the car on January 19th despite any adjudication of default. *See* Ex. C at p. 11 ("They just showed up with repo order called police etc bc my guys weren't releasing the car[.]").

32.     That same day, on January 19th, Defendants sent Plaintiffs a so-called "Repossession Order." *See* Ex. L, Repossession Order. According to the Repossession Order, Plaintiffs had "officially defaulted on your Agreement for the 2021 Rolls Royce Cullinan you financed from us for not having paid all payments due. . . . If you operate the vehicle, it will be immediately considered stolen property." *Id.*

**Despite the repossession, Defendants never dispose of the collateral, i.e., the car.**

33.     Despite repossessing the car, Defendants never sold the car to satisfy the alleged deficiency nor refunded any surplus to Plaintiffs. Nor did Defendants ever send Plaintiffs any notice of disposition of collateral as required by law.

34.     Defendants also rejected Plaintiffs' request for a refund of their $200,000.00 downpayment.

35.     In the months that followed, Defendants blamed Plaintiffs for causing the original deal with a downpayment of $150,000.00 to fall through. Indeed, Bonanno harassed and ridiculed Plaintiffs by accusing them of having the "credit of a homeless person." Ex. C at p. 12.

36.     Upon information and belief, Defendants never applied for a Certificate of Title from the Florida Department of Highway Safety and Motor Vehicles (FHSMV) for either of Plaintiffs' deals, because they never intended to honor them, but rather intended to repossess the car and refuse to return Plaintiffs' downpayments at all material times.

37.     At all relevant times, Plaintiffs made all the monthly payments to Defendants at their direction.

38.     All conditions precedent to this suit have been performed, occurred, or waived.

## COUNT I

### Fraud in the Inducement

39.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

40.     At all relevant times, Defendants represented to Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment.

41.     At all relevant times, Defendants represented to Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

42.     At all relevant times, after receiving Plaintiffs' credit application, Defendants represented to Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

43.     At all relevant times, after receiving Plaintiffs' downpayment, Defendants reversed course and told Plaintiffs that their credit application had been "denied."  Defendants further represented that Plaintiffs needed to return the car and lose their downpayment unless they signed paperwork for a new deal with different material terms.

44.     At all relevant times, Defendants knew or should have known that their representations were false.

45.     At all relevant times, Defendants intended that their misrepresentations would induce Plaintiffs to rely and act upon them.

46.     At all relevant times, Plaintiffs justifiably relied upon Defendants' representations in agreeing to buy the car for $550,000.00 with a $150,000.00 downpayment and remitting same to Defendants.

47.     As a result of Plaintiffs' reliance upon Defendants' misrepresentations, Plaintiffs have been damaged.  This includes, but is not limited to, the loss of their $150,000.00 payment, the loss of their subsequent additional $50,000.00 payment, the loss of all monthly payments made to Defendants, the loss of their financial investments in the car, including fueling and insurance, and the loss of use of the car.

WHEREFORE, Plaintiffs demand judgment against Defendants for all their damages, including punitive damages, plus pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

## COUNT II

### Negligent Misrepresentation

48.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

49.     At all relevant times, Defendants represented to Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment.

50.     At all relevant times, Defendants represented to Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

51.     At all relevant times, after receiving Plaintiffs' credit application, Defendants represented to Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

52.     At all relevant times, after receiving Plaintiffs' downpayment, Defendants reversed course and told Plaintiffs that their credit application had been "denied."  Defendants further represented that Plaintiffs needed to return the car and lose their downpayment unless they signed paperwork for a new deal with different material terms.

53.     At all relevant times, Defendants made these representations without knowing whether they were true or false, or made the statements under circumstances in which they should have known that the statements were false.

54.     At all relevant times, Defendants intended that their misrepresentations would induce Plaintiffs to rely and act upon them.

55.     At all relevant times, Plaintiffs justifiably relied upon Defendants' misrepresentations in agreeing to buy the car for $550,000.00 with a $150,000.00 downpayment and remitting same to Defendants.

56.     As a result of Plaintiffs' reliance upon Defendants' misrepresentations, Plaintiffs have been damaged.  This includes, but is not limited to, the loss of their $150,000.00 payment, the loss of their subsequent additional $50,000.00 payment, the loss of all monthly payments made to Defendants, the loss of their financial investments in the car, including fueling and insurance, and the loss of use of the car.

WHEREFORE, Plaintiffs demand judgment against Defendants for all their damages, including punitive damages, plus pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

## COUNT III

### Unjust Enrichment

57.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

58.     At all relevant times, Plaintiffs conferred benefits upon Defendants in the form of substantial down payments and monthly payments.

59.     At all relevant times, Defendants had knowledge and appreciation of the benefits conferred by Plaintiffs.

60.     At all relevant times, Defendants accepted and retained the benefits conferred by Plaintiffs.

61.     The circumstances are such that it would be inequitable for Defendants to retain the benefits without paying Plaintiffs fair value for them, because Defendants requested Plaintiffs to perform or knowingly and voluntarily accepted the benefits of their performance.

WHEREFORE, Plaintiffs demand judgment against Defendants for all their damages, including punitive damages, plus pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

## COUNT IV

### Promissory Estoppel

62.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

63.     At all relevant times, Defendants promised Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment.

64.     At all relevant times, Defendants promised Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

65.     At all relevant times, Defendants promised Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

66.     At all relevant times, after receiving Plaintiffs' downpayment, Defendants reversed course and told Plaintiffs that their credit application had been "denied."   Defendants further represented that Plaintiffs needed to return the car and lose their downpayment unless they signed paperwork for a new deal with different material terms.

67.     At all relevant times, Plaintiffs relied upon these promises to their detriment.

68.     At all relevant times, Defendants reasonably should have expected their promises to induce reliance in the form of action or forbearance on the part of Plaintiffs.

69.     Under the circumstances, injustice can be avoided only by enforcement of Defendants' promises to Charm City.

WHEREFORE, Plaintiffs demand judgment against Defendants for all their damages, including punitive damages, plus pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

**COUNT V**

**Violations of the Florida Deceptive and Unfair Trade Practices Act**

70.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

71.     This is an action pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §501.201 *et seq.*, Fla. Stat.  The provisions of FDUTPA are to be construed liberally to "protect the consuming public and legitimate business enterprises from those who engage in

unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in conduct of any trade or commerce." §501.202(2) Fla. Stat.

72.     At all relevant times, Plaintiffs were "consumers" within the meaning of FDUTPA.

73.     At all relevant times, Defendants were engaged in "trade or commerce" within the meaning of §501.203(8), Fla. Stat.

74.     At all relevant times, Defendants represented that the car had only 1,700 miles, when, in fact, it had 1,944 miles.   *See* Ex. B at p. 3 ("1700 miles brand new truck").   By misrepresenting the mileage on the car, Defendants violated FDUTPA.   *See* § 501.976(3), Fla. Stat. ("It is an unfair or deceptive act or practice, actionable under the Florida Deceptive and Unfair Trade Practices Act, for a dealer to: . . . (3) Represent the previous usage or status of a vehicle to be something that it was not, or make usage or status representations unless the dealer has correct information regarding the history of the vehicle to support the representations.").

75.     At all relevant times, Defendants represented to Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment, when, in fact, Defendants used such terms as a "bait and switch" and never intended to honor them.

76.     At all relevant times, Defendants represented to Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

77.     At all relevant times, after receipt of Plaintiffs' credit application, Defendants represented to Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

78.     Plaintiffs then executed a Buyer's Order to buy the car for $550,000.00 with a $150,000.00 downpayment – $50,000.00 more than the advertised price of $499,999.00.

79.     Upon information and belief, Bonanno was paid a commission of $50,000.00 for Plaintiffs' deal, which was unlawfully added to the car's sales price in violation of FDUTPA.  *See* § 501.976(11) ("It is an unfair or deceptive act or practice, actionable under the Florida Deceptive and Unfair Trade Practices Act, for a dealer to: . . . (11) Add to the cash price of a vehicle as defined in s. 520.02(2) any fee or charge other than those provided in that section and in rule 69V-50.001, Florida Administrative Code."); *id.* at § 501.976(16) (illegal for dealer to advertise price without including "all fees or charges that the customer must pay, including freight or destination charge, dealer preparation charge, and charges for undercoating or rustproofing").

80.     Defendants also unlawfully charged Plaintiffs a $995.00 "administration fee" that had not been disclosed in its advertisement.  *See* § 501.976(16).

81.     Defendants also unlawfully charged Plaintiffs $450.00 for a new tag—which is more than the actual governmental fee—without disclosing that a portion of "[t]his charge represents costs and profit to the dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale[,]" as required by § 501.976(18), Fla. Stat. *See* § 501.976(18).

82.     Despite repeatedly advising Plaintiffs that their credit application had been "approved," accepting their $150,000.00 downpayment, and allowing Plaintiffs to leave the dealership with the car, Defendants subsequently informed Plaintiffs that their previously "approved" credit application had been "denied."  Defendants further represented that Plaintiffs needed to return the car and would lose their downpayment, unless they signed paperwork for a new deal with different material terms, including a substantially higher downpayment of $225,000.00.

15

83.     When Plaintiffs allegedly defaulted on the new deal, Defendants used the police to repossess the car and refused to refund Plaintiffs the money they paid for the car, including their downpayments.

84.     Defendants never perfected any lien or security interest in the car prior to its repossession.

85.     Defendants acts and omissions in connection with their interactions with Plaintiffs were deceptive, unfair, and unconscionable, and were the result of a coordinated scheme to defraud Plaintiffs.

86.     As a direct and proximate result of Defendants' deceptive, unfair, and unconscionable acts and omissions, Plaintiffs have been damaged.  This includes, but is not limited to, the loss of their $150,000.00 payment, the loss of their subsequent additional $50,000.00 downpayment, the loss of all monthly payments made to Defendants, the loss of their financial investments in the car, including fueling and insurance, and the loss of use of the car.

WHEREFORE, Plaintiffs demand judgment against Defendants for their actual damages, pre- and post-judgment interest thereon to the extent allowable under applicable law, their costs and attorneys' fees pursuant to §501.211, and for any other relief the deemed just.

## COUNT VI

### Violation of Florida's Uniform Commercial Code

87.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

88.     This is an action pursuant to Florida's Uniform Commercial Code ("UCC"), § 679.601 *et seq*., Fla. Stat.

89.     Defendants violated Florida's UCC by (1) failing to provide Plaintiffs with sufficient notice when repossessing their car, a consumer good, *see* § 679.614, Fla. Stat., and (2) breaching the peace by using the police to repossess the car without judicial process, *see* § 679.609(2)(b).

90.     Defendants were an alleged "secured party" under these circumstances per §679.102(1)(ttt)(5), Fla. Stat.

91.     On or about January 18, 2023, Defendants used the police to help repossess the car from Plaintiffs.  *See* UCC Commentary ("A number of cases have held that a repossessing secured party's use of a law-enforcement officer without benefit of judicial process constituted a failure to comply with former Section 9-503.").

92.     Yet Defendants never sent Plaintiffs any notice of disposition of collateral as required by § 679.614, Fla. Stat.

93.     Nor did Defendants ever perfect any lien interest in the vehicle that would entitle them to repossess the car.

94.     As a result of Defendants' violations of the UCC, Plaintiffs have been damaged, and Defendants are liable to Plaintiffs in an amount equal to the sum of (i) any loss caused by the failure to comply, §679.625(2), and (ii) if the collateral is consumer goods, an amount not less than the credit service charge plus 10 percent of the principle amount of the obligation or the time-price differential plus 10% of the cash price. *See* § 679.625(3)(b), Fla. Stat.

WHEREFORE, Plaintiffs demand judgment against Defendants for their damages, including statutory damages, pre- and post-judgment interest thereon to the extent allowable under applicable law, their costs and attorney's fees pursuant to the UCC, and for any other relief deemed just.

## COUNT VII

### Violation of Florida's Motor Vehicle Retail Sales Finance Act

95.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

96.     This is an action for violation of Florida's Motor Vehicle Retail Sales Finance Act, § 520.01, Fla. Stat., *et seq.*, which requires the accurate disclose of certain information in connection with an installment sale contract to buy a car.  *See* § 520.07, Fla. Stat.

97.     In this case, the RISC for the "new deal" to buy the car for $550,000.00 with a $225,000.00 downpayment, at a rate of 18.9% interest, failed to accurately disclose the information required by § 520.07, Fla. Stat.

98.     The RISC failed to accurately disclose the "total sales price" as required by law. *See* § 520.07(2)(d), Fla. Stat. ("*Total sale price*.—In a credit sale, the 'total sale price,' using that term, and a descriptive explanation, including the amount of any down payment, such as 'the total price of your purchase on credit, including your down payment of $ .' The total sale price is the sum of the cash price, the items described in subparagraph (a)2. [i.e., the 'Amount Financed'], and the finance charge disclosed under paragraph (b).").

99.     The RISC also failed to accurately disclose the total "Finance Charge" as required by law.  *See* § 520.07(2)(b) ("*Finance charge*.—The 'finance charge,' using that term, and a brief description such as 'the dollar amount the credit will cost you.'").  Here, the RISC disclosed that the total "Amount Financed" at a rate of 18.9% interest was $359,554.70, but that the total "Finance Charge" was a mere $9,308.00:



Ex. B at p. 1.

100.    This was not an accurate disclosure because the total "Finance Charge" on a 60-month loan of $359,554.70 at a rate of 18.9% interest is $198,881.75, not $9,308.00.

101.    The RISC also failed to accurately disclose the "Total of Payments" as required by law. *See* § 520.07(2)(c), Fla. Stat. ("*Total of payments*.—The 'total of payments,' using that term, and a descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments.'"). Here, the RISC inaccurately disclosed that the "Total of Payments" was merely $558,334.00, when in fact the "Total of Payments" was $783,436.45.[1]

102.    The omission of these required disclosures violated § 520.07(2), Fla. Stat., thereby entitling Plaintiffs to damages in "an amount equal to any finance charge and any fees charged to the buyer by reason of delinquency, plus attorney's fees and costs incurred by the buyer to assert rights under this part." § 520.12(2), Fla. Stat.

WHEREFORE, Plaintiffs demand judgment against Defendants for their damages, including statutory damages, pre- and post-judgment interest thereon to the extent allowable under applicable law, their costs and attorney's fees pursuant to § 520.12(2), and for any other relief deemed just.

## COUNT VIII

### Violation of the Equal Credit Opportunity Act against Defendants

103.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

---

[1] The "Total of Payments" was computed by adding the Total Cash Price of $584,554,70 in the new Buyer's Order, plus the total finance charge of $198,881.75, for a total of $783,436.45.

104. This is an action pursuant to the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §1691 *et seq.*, Defendants' failure to provide Plaintiffs with a statement of reasons after an adverse action (i.e., a denial) had been taken on Plaintiffs' credit application. *Id.* §1691(d).

105. Defendants are creditors within the meaning of 15 U.S.C. §1691a(e) and 12 C.F.R. §202.2(l), because Defendants regularly extend credit or arrange for the extension of credit and participate in the decision of whether to extend credit.

106. At all relevant times, Defendants represented to Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment.

107. At all relevant times, Defendants represented to Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

108. On or about September 15, 2022, Plaintiffs submitted a credit application to Defendants in connection with their interest in financing the purchase of the car with a $150,000.00 downpayment.

109. At all relevant times, after receiving the credit application, Defendants represented to Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

110. Despite repeatedly advising Plaintiffs that their credit application had been "approved," accepting their $150,000.00 downpayment, and allowing Plaintiffs to leave the dealership with the car, Defendants subsequently informed Plaintiffs that their previously "approved" credit application had been "denied." Defendants further represented that Plaintiffs needed to return the car and would lose their downpayment, unless they signed paperwork for a new deal with different material terms, including a substantially higher downpayment of $225,000.00.

111.    At no time did Defendants provide Plaintiffs with any statement of reasons for why adverse action had been taken on their credit application, in violation of 15 U.S.C. §1691(d)(2).

112.    At no time did Defendants provide Plaintiffs with the written notification required by §202.9(a)(2) of Regulation B.

113.    As a result of the Defendants' violations, Plaintiffs have been damaged, and Defendants are liable to Plaintiffs in an amount equal to the sum of (i) any actual damages sustained plus (ii) punitive damages in an amount not greater than $10,000, plus the costs of the action, together with a reasonable attorney's fee.  15 U.S.C. §1691e(b), (d).

WHEREFORE, Plaintiffs demand judgment against Defendants for their damages, including punitive damages, for pre- and post-judgment interest thereon to the extent allowable under applicable law, for their costs and attorney's fees pursuant to 15 U.S.C. §1691e(d), and for any other relief deemed just.

## COUNT IX

### Violation of the Fair Credit Reporting Act against Defendants

114.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

115.    This is an action pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.*

116.    This action involves the willful, knowing, and/or negligent violations of the FCRA by Defendants, as creditors, and their failure to issue any adverse action notices to Plaintiffs, as required by §1681m(a).

117.    At all relevant times, Plaintiffs were "applicants" within the meaning of the FCRA. *See* 15 U.S.C. § 1691a(b).

118.    At all relevant times, Defendants were "creditors" as defined in 15 U.S.C. §1691a(e) and 12 CFR §202.2(l), and were purported users of consumer credit and other financial information as defined and contemplated by the FCRA at §§ 1681a(b) and 1681m.

119.    Upon information and belief, in accordance with Defendants' policies and procedures in credit sales, on or about the date that Defendants obtained Plaintiffs' credit application, Defendants requested, obtained, and used the consumer credit reports from one or more credit reporting agencies.

120.    Based upon Plaintiffs' credit reports, Defendants ridiculed Plaintiffs as having the "credit of a homeless person," denied Plaintiffs' credit application, wrongfully repossessed the car, and refused to refund any monies, thus taking adverse actions which, under the circumstances, violated 15 U.S.C. §1681m(a)(1), (2), and (3), because Defendants did not provide Plaintiffs with any of the information required by the FCRA when each adverse action was taken.

121.    Defendants' failures to comply with the FCRA were willful as contemplated by 15 U.S.C. §1681n.

122.    As a result of Defendants' willful noncompliance with the FCRA, Plaintiffs have been damaged, and Defendants are liable to Plaintiffs in an amount equal to the sum of (i) any actual damages sustained as a result of the failure, or damage of not less than $100 and not more than $1,000, or (ii) actual damages sustained as a result of the failure or $1,000, whichever is greater; (iii) such amount of punitive damages as the court may allow; and (iv) the costs of this action together with reasonable attorney's fees.  *See* 15 U.S.C. §1681n(a).

123.    Alternatively, Defendants' noncompliance with the FCRA was negligent as contemplated by 15 U.S.C. §1681o.

124.    As a result of Defendants' negligent noncompliance, Plaintiffs have been damaged, and Defendants are liable to Plaintiffs in an amount equal to the sum of (i) any actual damages sustained by the consumer as a result of Defendants' negligence, and (ii) the cost of the action together with reasonable attorney's fees pursuant to 15 U.S.C. §1681o.

WHEREFORE, Plaintiffs demand judgment against Defendants for their damages, including punitive damages, for pre- and post-judgment interest thereon to the extent allowable under applicable law, for their attorney's fees and costs pursuant to the FCRA, and for any other relief deemed just.

## COUNT X

### Violation of the Florida Consumer Collection Practices Act

125.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

126.    This is an action for violations of the Florida Consumer Collection Practices Act, § 559.551, Fla. Stat., *et seq.*

127.    Defendants violated the Act by using "willfully abusive language in communicating with the debtor" and attempting to collect an alleged debt.  § 559.72(8), Fla. Stat.

128.    Defendants used willfully abusive and derogatory language in communicating with Plaintiffs, as debtors:

> Bro I told u that before I got ur credit and bank statments, had negative money in the bank and *credit of a homeless person*. If you didn't want to do the deal you shouldn't have. I didn't force u to buy anything and stated over and over and over again before you drove off "you gonna be able to do the rest right" "2 weeks not a problem" and then u didn't pay him for 4 months. *That is not on me at all bro. I didn't make a deal and not keep my end at all*. I got nothing to do with Jacobs money. *If you'd have kept your word and paid when you said you'd have the car. I didn't agree to those terms you did.* I didn't promise to make payments on certain days you did. Can't

blame me for that man. I gave u 10k and basically lost my money too bro. But you knew the price when u signed the papers and you knew the price when u drove off. *Typically it's only $150k down but after running your shit that's not a deal that could be worked. You're not stupid no one told u $150k then changed it after you drove off*, structurally the deal changed before u even signed papers and were told many times of the change in down payment. *You're a big boy if you couldn't afford the down payment you shouldn't have signed the deal*. When I was there we discussed 2 weeks for u to clear it and months and months went by, that's not on me at all man, shit sucks, but I did everything I said I would do. *I'm not the one who made a deal and didn't keep up my end*[.]

Ex. C at 12 (emphasis added).  Defendants also threatened Plaintiffs with criminal action.  *See* Ex. L ("If you operate the vehicle, it will be immediately considered stolen property.").

129.  Defendants further violated the Act by using "a communication that *simulates in any manner* legal or judicial process or that *gives the appearance of being authorized*, issued, or approved by a government, governmental agency, or attorney at law, when it is not." § 559.72(10), Fla. Stat. (emphasis added).  Defendants sent Plaintiffs a so-called "Repossession Order," which not only simulated legal process, but also gave the appearance of having been authorized or approved by a government, when in fact it was not.  *See* Ex. L.

130.  Defendants further violated the Act by "[w]illfully communicat[ing] with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family." § 559.72(7).  Defendants repeatedly made harassing phone calls to Plaintiffs to collect the alleged debt.  *See* Ex. D (Sam writing "*You don't have to keep calling me* ima just take yall to court yall just not ganna rob me out my money yall got some funny scam going on . . . .") (emphasis added).

131.  As a result of Defendants' violations, Defendants are liable for Plaintiffs' "actual damages and for additional statutory damages as the court may allow, but not exceeding $1,000,

together with court costs and reasonable attorney's fees incurred by the plaintiff." § 559.77(2), Fla. Stat.  Defendants are also liable for punitive damages.  *Id.*

WHEREFORE, Plaintiffs demand judgment against Defendants for their damages, including statutory and punitive damages, for pre- and post-judgment interest thereon to the extent allowable under applicable law, for their attorney's fees and costs pursuant to § 559.77(2), Fla. Stat., and for any other relief deemed just.

## COUNT XI

## Civil Theft

132.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

133.    This is an action for treble damages under Florida's Civil Remedies for Criminal Practices Act, §§722.101, *et seq.*, Fla. Stat.

134.    At all relevant times, and with the intent to steal, Defendants represented to Plaintiffs that they could buy the car for $499,999.00 with a $150,000.00 downpayment.

135.    At all relevant times, Defendants represented to Plaintiffs that they would be "approved no matter the credit." Ex. B. at p. 3.

136.    At all relevant times, after receiving Plaintiffs' credit application, Defendants represented to Plaintiffs that their credit application to buy the car with a $150,000.00 downpayment had been "approved."

137.    Based upon these representations, Plaintiffs executed a Buyer's Order and other paperwork to buy the car for $550,000.00 with a $150,000.00 downpayment, which they paid to Defendants.

138.    After receiving Plaintiffs' downpayment, and with the intent to steal, Defendants reversed course and told Plaintiffs that their credit application had been "denied" and, therefore, they needed to return the car and would lose their downpayment, unless they signed paperwork for a new deal with different material terms.

139.    Based upon these representations, Plaintiffs returned to the dealership to execute a new Buyer's Order and other paperwork to buy the car for $550,000.00 with a $225,000.00 downpayment.

140.    Plaintiffs then made another $50,000.00 in downpayments to Defendants, for a total of $200,000.00.

141.    When Plaintiffs allegedly defaulted on the new deal, Defendants used the police to repossess the car from Plaintiffs.

142.    Despite repossessing the car, Defendants have refused to refund any monies to Plaintiffs.  Defendants have further failed to sell the car to satisfy the alleged deficiency owed by Plaintiffs and refund Plaintiffs any surplus.

143.    At all relevant times, Defendants obtained Plaintiffs' money and luxury jewelry with criminal intent, that is, with the intent to deprive them of a superior right to the money and luxury jewelry, and/or misappropriated Plaintiffs' money and luxury jewelry for Defendants' own use even though it was not lawfully entitled to the money.

144.    As a result of Defendants' actions and omissions, Plaintiffs have been damaged.

145.    On or about March 16, 2023, Plaintiffs provided Defendants with the requisite pre-suit notice pursuant to §722.11, Fla. Stat.

WHEREFORE, Plaintiffs demand judgment against Defendants for treble damages, punitive damages, attorney's fees and costs under §772.11, Fla. Stat., pre- and post-judgment interest, and for any other relief deemed just.

## COUNT XII

### Civil Conspiracy

146.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 38 as if fully set forth herein.

147.   At all relevant times, Defendants entered into an agreement amongst themselves to do an unlawful act by unlawful means, namely, to scam and defraud Plaintiffs out of their substantial downpayments.

148.   At all relevant times, Defendants committed overt acts in pursuance of the conspiracy, including but not limited to: representing that Plaintiffs had been approved to buy the car with a $150,000.00 downpayment; later representing that Plaintiffs' credit application had been denied and that they needed to return the car and lose their downpayment, unless they signed paperwork for a new deal with different material terms; deceiving Plaintiffs into executing a new deal to buy the car with a $225,000.00 downpayment; and, after receiving $200,000.00 from Plaintiffs, unlawfully repossessing the car without refunding any monies to Plaintiffs.

149.   As a result of Defendants' civil conspiracy, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendants for all their damages, including punitive damages, plus pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

## COUNT XIII

### *Per se* Violations of the Florida Deceptive and Unfair Trade Practices Act

150.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 to 33 as if fully set forth herein.

151.    This is an action for *per se* violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Fla. Stat., *et seq.*

152.    The Motor Vehicle Retail Sales Finance Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, and the Florida Consumer Collection Practices Act are all consumer protection statutes that proscribe unfair methods of competition and unfair, deceptive, and unconscionable acts or practices in consumer transactions.

153.    Defendants' violations of the Motor Vehicle Retail Sales Finance Act, as alleged and expressly incorporated herein, are *per se* FDUTPA violations. § 501.203(3)(c), Fla. Stat.

154.    Defendants' violations of the ECOA, as alleged and expressly incorporated herein, are *per se* FDUTPA violations. § 501.203(3)(c), Fla. Stat.

155.    Defendants' violations of the FCRA, as alleged and expressly incorporated herein, are *per se* FDUTPA violations. § 501.203(3)(c), Fla. Stat.

156.    Defendants' violations of the Florida Consumer Collection Practices Act, as alleged and expressly incorporated herein, are *per se* FDUTPA violations. § 501.203(3)(c), Fla. Stat.

157.    As a result of Defendants' *per se* FDUTPA violations, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendants for their actual damages, statutory damages, costs and attorneys' fees pursuant to §501.211, as well as for pre- and post-judgment interest thereon to the extent allowable under applicable law, and for any other relief deemed just.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com
SCHWEIKERT LAW PLLC
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Office: (305) 999-1906
Cell: (305) 926-9452

*Counsel for Plaintiffs*